## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 15-cr-20935-RKA

**UNITED STATES OF AMERICA**,

     *Plaintiff*,

v.

**ALEXANDER MANTOFEL**,

     *Defendant.*

_____/

### <u>ORDER</u>

Alexander Mantofel asks us to terminate the last 22 months of his supervised-release term. *See* Motion for Early Termination of Supervised Release (the "Motion") [ECF No. 88]. The Government and the U.S. Probation Office oppose his request. *See* Government's Response to Defendant's Motion for Early Termination of Supervised Release (the "Response") [ECF No. 92] at 2. After careful review, we **DENY** the Motion.

### THE FACTS

On March 18, 2016, Mantofel pled guilty to one count of conspiracy to possess with the intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 846. *See* Presentence Investigation Report (the "PSI") [ECF No. 54] ¶ 1. Mantofel admitted that he sold 55.9 grams of "Ice" (high-purity methamphetamine)—"conduct which he knew was in violation of Federal law." *Id.* ¶¶ 13, 20. Mantofel's arrest was part of a larger investigation into a methamphetamine network from Nevada. *Id.* ¶ 7. Together with his co-conspirator, Mantofel bought the drugs from a local supplier and then sold them to an undercover agent. *Id.* ¶¶ 8–13. On May 24, 2016, the Court sentenced Mantofel to 120 months in prison—to be followed by 5 years of supervised release. *See* Judgment

[ECF No. 62] at 2–3. A Rule 35 motion reduced his prison sentence to 42 months. *See* Order Granting the Government's Motion for Rule 35 ("Rule 35 Motion") [ECF No. 83]. As of this writing, then, Mantofel has completed 37.4 months (approximately 62%) of his supervised-release term, which is set to expire on August 15, 2024. *See* Motion ¶ 9.

Mantofel has a long criminal record. *See* PSI at 9–13. He committed his first adult offense at 24, when he was arrested for marijuana possession and tampering with evidence. *Id.* at 9. In the two-year period that followed, he was arrested five more times for various crimes—including repeated drug offenses, petty theft, and disorderly conduct. *Id.* at 9–13. His disrespect for the law and law enforcement officers was on full display during his April 3, 2013, arrest, in which he attempted "to swallow loose marijuana particles" as police approached his vehicle. *Id.* at 9. "[Mantofel] was ordered to stop, but failed to do so. He then yelled, 'You have no evidence now. . . . Where is the evidence?!'" *Ibid.* Mantofel has also demonstrated an unfortunate tendency to resist arrest and to tamper with evidence, crimes that accompany no fewer than three—or half—of his adult arrests. *Ibid.*

Mantofel now "requests that this Honorable Court enter an order terminating his term of supervised release[.]" Motion at 1. If granted, Mantofel's Motion would cut out the remaining 22.6 months—about 38%—of his total supervised-release term. In support of this request, Mantofel offers a single argument: that his improved behavior justifies early termination. *Id.* ¶ 11 ("Mr. Mantofel respectfully submits that his conduct while on supervision warrants the relief herein sought."); *id.* ¶ 7 ("Since his release from the Bureau of Prisons, Mr. Mantofel has reintegrated into society and by all accounts he has completely turned his life around. Mr. Mantofel is sober, he recently married the love of his life, he is gainfully employed as an employment recruiter in the tech industry, and he has been volunteering his time in order to give back to the community."); *id.* ¶ 8 ("Those that know Mr. Mantofel, have witnessed his post-conviction rehabilitation and transformation as illustrated in their letters submitted to the Court.").

To demonstrate his improved conduct and civic engagement, Mantofel submits several letters from members of his community—all of which highlight his efforts at self-improvement. As an active member of his religious community, Mantofel "volunteers countless hours per week, giving back to his community," "has volunteered his time almost every Thursday night delivering half a dozen boxes to families in need," and "spends hours doing the heavy lifting me, while I produce the [religious] events hosting 200 plus people." *Ibid.* And Mantofel's behavior has left an impression on the people who know him. One wrote that "Alex has proven himself beyond the shadow of a doubt that he is a changed man." *Ibid.* Another believes "Alex has exemplified all of the traits I look for in a model citizen and leader." *Ibid.* And a third "can strongly testify to his character as a man of this community and his commitment to making the world a better place." *Ibid.*

**THE LAW**

We have statutory authority to terminate Mantofel's term of supervised release under 18 U.S.C. § 3583(e)(1), which provides, in pertinent part, as follows:

> **(e) Modification of Conditions or Revocation**.—The court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)—
>
>> (1)   terminate a term of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the modification of probation, if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice[.]

18 U.S.C. § 3583(e)(1).

Before terminating someone's supervised release under § 3583(e)(1), district courts must make "two determinations: first, that the defendant completed a year of supervised release as required by the statute; and second, that the § 3553(a) factors counsel in favor of granting relief." *United States v. Tinker*, 14 F.4th 1234, 1240 (11th Cir. 2021) (citing *United States v. Johnson*, 877 F.3d 993, 997–98 (11th

Cir. 2017)). "The relevant § 3553(a) factors are: (1) the nature and circumstances of the offense; (2) the defendant's history and characteristics; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with educational and vocational training, medical care, or correctional treatment; (6) the applicable guideline range; (7) any pertinent policy statements set forth by the Sentencing Commission; (8) the need to avoid unwarranted sentencing disparities; and (9) the need to provide restitution." *United States v. Cordero*, 7 F.4th 1058, 1069 (11th Cir. 2021).

"In weighing the § 3553(a) factors, the court need not articulate the applicability of each factor, as long as the record demonstrates that the pertinent factors were taken into account[.]" *United States v. Douglas*, 576 F.3d 1216, 1219 (11th Cir. 2009) (cleaned up); *see also United States v. Cochran*, 815 F. App'x 361, 363 (11th Cir. 2020) ("In ruling on a motion for early termination of supervised release, the 'sentencing court need not explain each factor's applicability, nor always explicitly articulate that it considered the factors,' but we must be able to discern from the order and the record that the district court considered the applicable § 3553(a) factors." (quoting *Johnson*, 877 F.3d at 997–98)). "Ultimately, modification of a term of supervised release is a matter of discretion." *United States v. Jimenez*, 2017 U.S. Dist. LEXIS 137740, at *1 (M.D. Fla. Aug. 28, 2017) (Dalton, J.) (citing *United States v. Perry*, 397 F. App'x 521, 522 (11th Cir. 2010)).

### ANALYSIS

As we've explained, to prevail here, Mantofel must satisfy both of § 3583(e)(1)'s elements. *See Tinker*, 14 F.4th at 1240. And he unquestionably satisfies the first: He's served 14 months of supervised release. Unfortunately, Mantofel falters at the second because the following § 3553(a) factors weigh decisively against early termination: (1) the nature and circumstances of the offense; (2) his history and characteristics; (3) the need for deterrence; and (4) the need to protect the public.[1] Of course, "[t]he

---

[1] And Mantofel never suggests that some other factor—*e.g.*, "(6) the applicable guideline range; (7) any pertinent policy statements set forth by the Sentencing Commission; (8) the need to avoid unwarranted

court need not articulate the applicability of each factor," *Douglas*, 576 F.3d at 1219 (cleaned up),
because "modification of a term of supervised release is a matter of discretion," *Jimenez*, 2017 U.S.
Dist. LEXIS 137740, at *1.

We start, then, with the nature and circumstances of the offense. *See* 18 U.S.C. § 3553(a)(1).
Selling high-purity methamphetamines is a serious crime—a point the Eleventh Circuit has made
crystal clear. *See United States v. Nunez-Gonzales*, 223 F. App'x 924, 927 (11th Cir. 2007) (noting "the
severity of the crime of importing a dangerous drug, such as methamphetamine, including the effect
that it has on society"); *see also United States v. Robinson*, 466 F. Supp. 3d 524, 531 (E.D. Pa. 2020) (citing
National        Institute        on        Drug        Abuse,        Drug        Facts,        Revised        May        2019,
https://www.drugabuse.gov/publications/drugfacts/methamphetamine)        ("The        drug        charge
concerns a dangerous drug, methamphetamine, trafficked in large amounts. Methamphetamines as a
class of drug are particularly dangerous, because they are stimulants, not sedatives, and can induce
paranoia, hallucinations, and violent behavior."). Methamphetamines are so dangerous and destructive
to society that the "average and median length of imprisonment for methamphetamine offenders
during fiscal year 2017 were 91 months and 72 months, respectively, *higher than for any other drug*, and a
30% higher average and a 26.32% higher median than for heroin (70 months and 57 months,
respectively)." *United States v. Johnson*, 379 F. Supp. 3d 1213, 1225 n.12 (M.D. Ala. 2019) (cleaned up
& emphasis added). This first factor, in short, militates against early termination.

*Second*, Mantofel's history and characteristics. As we've detailed, Mantofel's criminal history is
long and varied. *See* PSI at 9–13. He insists that he's a changed man. *See* Motion ¶ 7 ("[H]e has
completely turned his life around."). And, as we've noted, he *has* complied with the terms of his
supervision. *Id.* ¶ 12. But "courts routinely hold that probation compliance alone doesn't justify early

---

sentencing disparities; [or] (9) the need to provide restitution," *Cordero*, 7 F.4th at 1069—justifies his
early termination.

termination." Order Denying Motion for Early Termination, *United States v. Lewis*, No. 21-tp-60008, ECF No. 7 at 3 (S.D. Fla. Apr. 29, 2022) (Altman, J.); *see also United States v. Hinton*, 2021 U.S. Dist. LEXIS 195998, at *3 (M.D. Fla. Oct. 12, 2021) (Chappell, J.) ("[C]omplying with the terms of supervised release is expected and the baseline for all individuals on supervised release."); *United States v. Reisner*, 2008 WL 3896010, at *1 (N.D. Fla. Aug. 20, 2008) (denying motion for early termination because "[f]ull compliance, after all, is merely what is expected of all people serving terms of supervised release" (cleaned up)); *United States v. West*, 2011 WL 1458723, at *1 (M.D. Ga. Apr. 15, 2011) (denying motion for early termination where the defendant cited only his compliance with release conditions because "being a productive member of society and exhibiting good behavior is what is expected of every individual, especially those who have been convicted of a criminal offense and are currently serving a term of supervised release"). This Court, in fact, has consistently denied motions to alter the terms of a sentence based solely (or even primarily) on a supervisee's compliance. *See, e.g.*, Order Denying Motion for Early Termination, *United States v. Henderson*, No. 21-tp-60021, ECF No. 7 at 4 (S.D. Fla. May 18, 2022) (Altman, J.) (denying motion for early termination of supervised release despite the defendant's good behavior while in custody and full compliance while on release); *see also* Order Denying Motion for Early Termination, *United States v. Vargas*, No. 19-cr-60099, ECF No. 49 at 1 (S.D. Fla. Feb. 17, 2022) (Altman, J.) ("[C]ompliance alone isn't enough to justify early termination—principally because compliance is what we expect from *all* defendants.").

That's not to say that we should ignore Mantofel's compliance. To the contrary, a defendant will have earned early termination if he "demonstrate[s] exceptionally good behavior or other extraordinary circumstances." *Lewis*, No. 21-tp-60008, ECF No. 7 at 4 (quoting *Reisner*, 2008 WL 3896010, at *1). And Mantofel's recent behavior *has* struck his advocates as exceptional. *See* Motion ¶ 8 (Rabbi Menahem Katz observing that he's "worked with thousands of defendants in the criminal justice system over the past 27 years" and "can tell [the Court] without a doubt that there is no one

that [he's] met that has made such major change in his life like Alex"); *ibid.* (Matthew Wright, Esq., writing that "[A]lex surprised me with how much he took advantage of the opportunity by working harder than I thought possible, creating opportunities for himself to improve I would never have imagined, and obtain [sic] results that are beyond what I thought I could realistically hope to"); *ibid.* (Steve Eisenberg explaining that, "[f]or the past few years since I've known Alex, he's gone above and beyond to make sure the events for the Jewish community come to light"). We commend Mantofel for turning his life around. But it's hard to call compliance with the law "exceptional." *See United States v. Laine*, 404 F. App'x 571, 573–74 (3d Cir. 2010) (requiring an "exceptional or extraordinary" reason for early termination and finding that "[s]imple compliance with the conditions of supervised release [is] expected and not exceptional"); *United States v. McKay*, 352 F. Supp. 2d 359, 361 (E.D.N.Y. 2005) (noting that, to justify early termination, the defendant's behavior must be "unusual . . . [and not] simply because he has successfully served a portion of his supervised release").

On this point, the Eastern District of New York's ruling in *McKay* and our decision in *Lewis* are instructive. In *McKay*, the defendant "[was] an active member of his community for many years and [was] active in many organizations such as the NAACP and the Masons," exhibited "laudable" behavior, and contributed as "a credit to his family and community." *Id.* at 360. Despite this, the court found "that McKay . . . failed to present facts and circumstances that demonstrate the 'exceptionally good behavior' referred to in the precedents" and denied his motion for early termination. *Id.* at 361. In *Lewis*, the defendant raised three kids and worked two jobs while "volunteering with state and county out-reach programs to help [those] with mental disabilities and at risk youths." *Lewis*, No. 21-tp-60008, ECF No. 7 at 3 (cleaned up). We characterized these efforts as "fail[ing] to show the kinds of extraordinary circumstances that would warrant early termination." *Id.* at 4. Lewis and McKay's track records are similar to Mantofel's—and their behavior didn't warrant early termination. Mantofel's history and characteristics thus counsel against early termination.

The final factors—the need for the sentence "to [afford] adequate deterrence to criminal conduct," to provide "just punishment," and to "protect the public from further crimes of the defendant"—likewise weigh against termination. *See* § 3553(a)(2)(B), (C). Mantofel committed a serious crime—and he did it after accumulating a dangerous, and disconcerting, rap sheet. To terminate his supervision now—little more than halfway through his term—would send precisely the wrong message: that drug crimes aren't serious, that the destructive societal effects of methamphetamines are overblown, and that the penalties set out in our federal drug laws needn't be strictly followed. Terminating Mantofel's supervised release now, in other words, would decrease, rather than increase, the citizenry's respect for the law.

One more thing. We imposed a term of supervised release on Mantofel to "improve the odds of a successful transition from the prison to liberty." *Perry*, 397 F. App'x at 522 (cleaned up); *see also ibid.* (explaining that helping defendants transition back into society is what "[s]upervised release was designed to [do]"). And that plan appears to be working. Mantofel is rightly proud of the steps he's taken these last few years to improve his life and future. But this isn't the time for half-measures. The Court deliberately ordered Mantofel to serve *five years* of supervised release because we felt that *five years* was necessary to help him transition back into society. *See* PSI ¶ 82 (citing 21 U.S.C. § 841(b)(1)(A)(viii)). And nothing Mantofel has done—and nothing he's said—has convinced us that a shorter term would similarly effectuate our sentencing objectives.

For all these reasons, Mantofel's Motion for Early Termination of Supervised Release [ECF No. 88] is **DENIED**.

**DONE AND ORDERED** in the Southern District of Florida, this 10th day of October 2022.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record